# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 6, 2009

## STATE OF TENNESSEE v. JAMES ALFRED GOODMAN

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5758     Joe H. Walker, III, Judge**

---

**No. W2008-01080-CCA-R3-CD  - Filed March 25, 2009**

---

The defendant, James Alfred Goodman, was convicted by a Tipton County jury of aggravated robbery, a Class B felony, and evading arrest – endangering others, a Class D felony, and sentenced as a Range I, standard offender to ten years and three years, respectively, to be served consecutively in confinement.  On appeal, he argues that:  (1) the trial court erred in not considering his motion to proceed in *propria persona*; (2) his right to a fair trial was prejudiced by the State's failure to produce all of his property in its possession; (3) his right to confront witnesses was "abridged and violated"; and (4) the evidence is insufficient to sustain his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Gary F. Antrican, District Public Defender; Lyle A. Jones (at trial and on appeal) and David Stockton (at trial), Assistant District Public Defenders, for the appellant, James Alfred Goodman.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and Patrick Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of the defendant's July 2007 encounter with a Save-a-Lot grocery store manager and the defendant's ensuing flight from the authorities.  For his actions, the defendant was indicted on one count of aggravated robbery and one count of felony evading arrest – endangering others.

A trial was conducted on March 31, 2008, at which the victim, Beth Ezra, testified that she was the store manager of the Covington Save-a-Lot store where she had worked for twenty-five years. On July 11, 2007, the victim worked an 8:00 a.m. to 2:00 p.m. shift and, unlike her normal end-of-shift routine, asked her assistant manager to make the bank deposit for her so she could attend to a previous matter. The victim had her "[m]edium-sized, black shoulder bag" and its contents with her when she left the store. As she walked through the parking lot toward her car, "a gentleman appeared from behind a gold colored SUV and approached [her]." She elaborated, "I walked between a purple Mustang and a gold SUV to get to my car and did not see him and then when I heard him, turned, and he had just arisen from somewhere. He was not standing between those two vehicles when I approached my car." The victim identified the defendant as the man who approached her.

The victim testified that the defendant, who was standing approximately a foot away, told her, "Give me the money bag." She described the defendant's voice as "gruff and in a low tone" and saw that "he had some type of something on his throat," but she was still able to understand him. The victim told the defendant that she did not have the money bag, and "he raised his hand which was covered in a terrycloth towel of some type and said, 'That bag,' and pointed to [her] shoulder" where her purse was located. She recalled that at that point, the defendant touched her other shoulder using his hand that was not covered in the terrycloth towel. She said there "appeared to be something in his hand" although she "could not see because of the terrycloth covering over his hand." The victim gave the defendant her purse because she "felt that that was the only choice [she] had. [She] assumed he had a weapon pointed at [her] . . . [and] was afraid that if [she] didn't comply, he would shoot [her]." She acknowledged, however, that she never actually saw a gun.

The victim recalled that after the defendant obtained her purse, he walked at a rapid pace "across the parking lot toward the south end of the lot" and got into a "red Ford pickup." The defendant drove out of "the south end of the parking lot and turned on Peeler Street." The victim got into her car, picked up a store employee to accompany her, and followed the defendant from "a short distance." The victim got the defendant's license plate number and relayed it to a police officer who was, by that time, at the store. The victim followed the defendant through several turns from a distance of "four to five car lengths." The victim remained on the phone with the police dispatch operator while following the defendant until she was told that an officer was behind her on the road and requested that she pull off. The victim obliged, and the officer began following the defendant. She recalled that the first patrol car she saw was from the Covington Police Department and it was followed by two or three other Covington Police Department patrol cars, as well as a car from the sheriff's department, and most, if not all, of the cars had their lights and sirens activated. The victim noted that her handbag had since been returned to her from the Covington Police Department.

On cross-examination, the victim stated that she "never leave[s] [the store] with the money bag obvious." She noted that there were no other store employees with her in the parking lot. She recalled that an employee had been in the parking lot gathering carts, but she was not sure if he was still in the parking lot or had already pushed the carts to the front of the lot. The victim said that the defendant did not try to hand her a card and she did not hit the defendant with her purse.

Officer Andrew Hefner with the Covington Police Department testified that he responded to a robbery in progress at Save-a-Lot around 2:00 p.m. on July 11, 2007. Officer Hefner was the first officer to take over pursuit of the defendant's vehicle from the victim and had his "lights and sirens" activated the entire time. Officer Hefner got within "three car lengths" of the defendant's vehicle while pursuing him down "Highway 59 West . . . a two-lane road." Several unmarked and marked patrol cars followed behind him as he chased the defendant for approximately "16 to 17 miles." He estimated that they traveled "a little bit over the posted speed [limit]; not by much." Officer Hefner noted that "[t]here was civilian traffic" on the road during the pursuit.

Detective Scotty Delashmit of the Tipton County Sheriff's Department testified that he received a radio broadcast that "a robbery . . . had taken place in the Sav[e]-a-Lot parking lot. The person was believed to be armed with some sort of weapon traveling on 59 West with several Covington cars in pursuit and the City of Covington was requesting county assistance and county backup." Detective Delashmit joined the pursuit with his emergency equipment activated, as was the equipment on the other marked and unmarked cars already in pursuit.

Detective Delashmit recalled that at one point Investigator Mike Rose with the sheriff's department, who was responding from the opposite direction, tried unsuccessfully to stop the defendant by pulling his vehicle into the lane of oncoming traffic. However, the defendant "jerked over toward [Investigator] Rose's vehicle" and forced Rose to get out of his way. A civilian vehicle that was traveling approximately four car lengths behind Investigator Rose pulled off on the side of the road until the caravan of officers passed. Detective Delashmit noted that Investigator Rose was driving an unmarked vehicle, but "his blue lights and his clear lights [were] blinking." The officers were able to effectuate the stop of the defendant's vehicle when Investigator Rose "managed to get in front of the defendant and [they] basically had a rolling roadblock[.]"

Detective Delashmit had a map created of the entire incident area using the Global Information System positioning system and the route from Save-a-Lot to where the chase finally ended entailed eighteen miles. The pursuit took place on roads that were hilly and, at times, small, narrow, and curvy. "Several" civilian vehicles were encountered during the pursuit, but Detective Delashmit could not recall how many.

On cross-examination, Detective Delashmit testified that once the defendant was pulled over and ordered to get out of the car, "he didn't get out of the car so [they] went up and . . . assisted him getting out of the car." Detective Delashmit recalled that the defendant had a tracheotomy tube hole in his throat but did not see an actual tube coming out of his throat. He acknowledged that no gun, knife, bludgeon, deadly weapon, or anything fashioned to look like such, was uncovered in the search of the defendant's truck.

Investigator Mike Rose with the Tipton County Sheriff's Department testified that when he first attempted to stop the defendant's vehicle by pulling over into his lane, he left the defendant enough space to come to a safe stop, but the defendant did not stop. He noted that his emergency lights and sirens were activated. After the failed attempt to stop the defendant, Investigator Rose turned his vehicle around and joined the pursuit of the defendant. He recalled that they were about to reach a dangerous intersection, so he pulled up beside the defendant and tried to ease him into the

ditch, but the defendant jerked away. Investigator Rose recalled he "was finally able to get around [the defendant] and with me in front of him and Detective Delashmit behind him, we used a boxing maneuver and boxed him in and got him stopped." He estimated that they traveled "probably six, seven miles" from the time he turned around after the failed attempt to stop the defendant to the time the defendant was finally stopped.

The defense called Sergeant Walter Antracan, shift supervisor with Tipton County Corrections, who testified that certain items were taken from the defendant when he was booked. Namely, "one bag of 93 cents, a black comb, set of keys, a Tennessee driver's license[,]" a shirt with a string attached through the collar, a pair of blue jeans with a brown belt, a "worn, torn" tee-shirt, and "some paper that he got in through the mail." Sergeant Antracan said that to the best of his knowledge, the defendant's belongings had not been tampered with since taken into custody. On cross-examination, Sergeant Antracan acknowledged that he could only testify as to what the defendant had on him when he was brought into jail and did not know about items the defendant may have had on him when arrested that were not sent along with the defendant to jail.

Dominique Morgan testified that she lived in an apartment complex directly behind Save-a-Lot. She said that she had "seen [the defendant] around" because she "remember[ed] the thing in his neck." Morgan recalled an incident when she saw the defendant in the Save-a-Lot parking lot and "saw a lady . . . strik[e] him with a purse . . . [a] few times." She did not see who the lady was nor was she certain of the date. Morgan did not get involved in the skirmish and admitted she did not call the police or anyone else. She said she did go to get her friend, but her friend refused to return to the scene with her. Morgan stated she went back to the parking lot three hours later, but nothing was going on at that time. She testified she was contacted by a man named Jeff with the public defender's office the week before trial who wanted to "talk about a situation that happened back last summer in July sometime." Morgan did not know how anyone would have known that she had seen something unless her friends who lived next door had told someone.

Officer James Boggus of the Covington Police Department testified that he did not recall having seen the defendant before, nor did he have an independent recollection of finding the defendant panhandling in front of the La Losteca Restaurant.

The defendant testified that he made his living "[b]y getting SSI disability and by panhandling." He said that he lived in Memphis before moving to Tipton County and identified his panhandling permits from the City of Memphis. The defendant stated that he panhandled in the La Losteca parking lot on July 11 starting around 10:30 a.m. La Losteca is in the same strip mall as Save-a-Lot. The defendant said that business was going well that day, until Officer Boggus arrived and asked him to move away from the front of the restaurant. The defendant moved to a curb behind Mapco, which was in front of Save-a-Lot, around "1:30, quarter till 2:00."

The defendant recalled that as he was sitting on the curb, he saw the victim walking to her car so he walked up to her and tapped on the top of her car. The victim did not look up when he tapped on her car, so the defendant touched her on the shoulder to get her attention. The victim turned around and looked frightened, so the defendant "tried to give her [his] little card so that [he] could introduce [him]self without upsetting her." However, the victim started to hit the defendant

-4-

with her purse while he tried to move away from her. He noted that she was holding her purse by the shoulder strap. The defendant said that after he had "been hit numerous times with the purse[,] . . . [he] was tired of being hit with it and [he] reached back and grabbed it. [He] was trying to get away from being hit with it anymore."

The defendant testified that he got the victim's purse, then "tr[ied] to get to [his] truck and get the door locked to keep from getting hit some more." He said that the victim yelled at him as he went to his truck but did not follow him. Asked why he did not drop the purse, the defendant stated that a man "c[a]me from over there by her car" and started hitting him on the side of the face. He had previously seen that man "taking shopping carts and putting them together and . . . taking them back to the front of the store." The defendant said that his shirt was torn "[w]hen the man pulled [his] shirt and [his] tube came out." He also explained that the string attached to his outer shirt was "to hold the tube in place." The defendant stated that he was wearing a trach tube during the altercation and it was pulled out by the man who was gathering shopping carts.

The defendant testified that he finally got into his truck and drove away. He said that he did not drop the purse out of his window because "[i]t's real difficult to roll [the window] down." He stopped at a stop sign and tried to open the door to discard the purse, but the victim was behind him and "a guy got out of her car and started towards [him] and [he] took off again." The defendant stated that "[he] thought [he] was the victim. [He] was looking for a police officer. [He] was the one getting beat up beside the head."

Asked why he did not stop as soon as he saw a police officer, the defendant said that he "didn't see one until [he] stopped and they asked [him] to get out of the truck." He stated that he did not see anyone "except the lady behind me"; he did not see any of the officers with their lights and sirens activated. The defendant recalled seeing a vehicle coming toward him at some point but did not see any lights or sirens on it. The defendant eventually stopped when an officer "pulled up to the left of [him] and [he] pulled in behind him and stopped." The defendant testified that once stopped, an officer came toward him with his pistol drawn and ordered him out of the truck. The defendant explained that he is a "pretty good sized" man and had difficultly getting out of his small truck, so the officers reached in and pulled him out.

The defendant stated that an ambulance was sent to the scene because he thought he was having a seizure. He also explained that he has had four or five surgeries to his face and neck and cannot move his head. The defendant said that he did not have a weapon or anything shaped to look like one and that the cloth the victim saw was "for mucus from [his] throat." The defendant stated that he did not know the victim "had a money bag ever in her life" and only approached her to ask for a dollar.

On cross-examination, the defendant denied asking Gregory McKee, a fellow inmate at the Tipton County Jail, to lie and testify that he saw a man and woman attacking the defendant. He also denied telling McKee that there was a black woman who was going to lie and testify for him. Asked how he could not hear the siren on a police car that was close enough behind him to see his license plate, the defendant said he "went into a complex partial seizure at some point after [he] had turned onto Highway 59." He elaborated that during such a seizure, "[y]ou're able to continue what you

were doing if you are doing some repetitive action while the seizure comes on." He did not know what happened from the time he went into the seizure until he was stopped by Investigator Rose. Asked how much money he had on him when he was arrested, the defendant said he thought he had twenty-four dollars because he only needed one more dollar to get his groceries for the week. On redirect examination, the defendant said that his terrycloth rag was left in his truck, and his pain and seizure medications were also not accounted for with his property at the jail.

Rebuttal witness for the State, Gregory McKee, testified that he was not a witness to the July 11, 2007, alleged aggravated robbery at Save-a-Lot, but the defendant mentioned to him that he should say "there was a fracas in the parking lot at the Sav[e]-a-Lot." He elaborated that the fracas involved "[s]ome man and some woman and some other man which I guess would be [the defendant]." McKee said that the defendant offered to pay him "$500.00 if he was [found] guilty and a thousand if he wasn't." He recalled that the defendant also mentioned that a black woman was going to testify. Defense counsel did not cross-examine McKee, stating that "the Rules of Professional Conduct prohibit me from cross-examining this witness."

After McKee's rebuttal testimony, the defendant testified that he had spoken with McKee before, but it was only "[s]tandard jailhouse talk." He said that McKee told him "he saw it and that he . . . would come and testify [because] . . . [h]e just didn't want to see anybody go to jail that wasn't supposed to be there." The defendant denied paying Dominique Morgan to testify on his behalf and said he did not know her.

At the conclusion of the proof, the jury returned guilty verdicts to both offenses as charged. The trial court sentenced the defendant to ten years for the aggravated robbery conviction for which the jury also assessed a $10,000 fine, and three years for the felony evading arrest conviction for which the jury also assessed a $1000 fine. The court ordered that the sentences be served consecutively. The defendant appealed.

## ANALYSIS

### I. Self-Representation

The defendant first argues that the trial court erred in not considering his motion to proceed in *propria persona*. In Tennessee, courts have recognized only two basic constitutionally-guaranteed methods of representation of a criminal defendant: *pro se* or through an attorney. These rights are alternative. A defendant has no state or federal constitutional right both to represent himself and to be represented by counsel. State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976). In order to activate the right of self-representation, the defendant must: (1) timely assert the right to proceed *pro se*; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988). Generally, a defendant must assert the right of self-representation prior to jury selection to be considered timely. See id. at 629. In determining whether a defendant intelligently and knowingly waived his right to counsel, the trial court must question the defendant extensively regarding his ability to represent himself. State v. Northington, 667 S.W.2d 57, 61 (Tenn. 1984); Herrod, 754 S.W.2d at 630.

The defendant asserts that he wanted to fire counsel and represent himself. He alleges that he filed a handwritten motion to the trial court requesting such, but the court did not hold a hearing on the matter. The record before us contains the affidavit of complaint from the general sessions court showing that the defendant requested to have counsel appointed, and such was done on August 24, 2007. There is also an order in the technical record from the trial court appointing legal counsel on November 8, 2007.

Noticeably missing from the record, however, is any handwritten motion from the defendant to the trial court requesting that he represent himself. There is no indication in the record as to when this motion was made or any proof that it was ever made. From the record before us, it is undeterminable if the defendant "timely assert[ed] the right to proceed *pro se*," if there was a clear and unequivocal exercise of that right, and if he knowingly and intelligently waived his right to assistance of counsel. See Herrod, 754 S.W.2d at 629-30. It is the duty of the defendant to prepare a fair, accurate, and complete record of what transpired in the trial court. Tenn. R. App. P. 24(b). "Absent the necessary relevant material in the record an appellate court cannot consider the merits of an issue." State v. Ballard, 855 S.W.2d 557, 561 (Tenn. 1993). We also note that even if the defendant had clearly and unequivocally exercised his right to represent himself, his subsequent actions of not reasserting this desire and allowing counsel to participate in trial arguably indicate that he abandoned his intention to represent himself. See State v. Robert Hood, No. W2004-01678-CCA-R3-DD, 2005 WL 2219691, at *13 (Tenn. Crim. App. Sept. 13, 2005).

## II. Fair Trial

The defendant next argues that his right to a fair trial was prejudiced by the failure of the Tipton County Jail's custodian of property to produce all of the defendant's property in his possession. According to the defendant, he filed a discovery request and issued a subpoena to the custodian of property, Sergeant Antracan, instructing him to bring all of the defendant's "jail property" with him to trial. Sergeant Antracan appeared at trial with the defendant's property but apparently did not bring a sum of money and the terrycloth rag the defendant used to wipe the mucus from his tracheotomy tube because those items were found subsequent to trial in a separate area of the property room.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

In State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), the Tennessee Supreme Court addressed the State's loss or destruction of evidence alleged to have been exculpatory. The court stated that the first step is to determine whether the State had a duty to preserve the evidence and that,

generally, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. at 917 (footnote omitted). Quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2533-34 (1984), the court said that duty was limited to evidence that "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. The court continued:

> If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach. Those factors include:
>
> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.
>
> Of course, as previously stated, the central objective is to protect the defendant's right to a fundamentally fair trial.

Id. (footnote omitted).

With regard to the terrycloth rag, the defendant argues that he was prejudiced by not having the actual rag involved in the incident because "he could have demonstrated to the jury that no one could reasonably believe it concealed a weapon." Although lengthy, the following exchange during the cross-examination of the defendant at trial is key to this issue:

Q: Now, you're not denying that you had a terrycloth or some sort of rag wrapped around your hand at that time, are you?

A: No, sir.

Q: No, sir, you're not denying it?

A: No, sir. In my hand.

Q: Sir?

A: In my hand just like this (indicating).

Q: That you were just carrying?

-8-

A: Just like this (indicating).

Q: And for the record you are holding a handkerchief or something in your hand.

A: I'm holding my wash rag to absorb the mucus that comes out of my stomach.

Q: I understand that, but you heard her testify that it was wrapped around your hand in such a way that she couldn't see what was in it. Now, is that true or not true?

A: That like, I don't -- Can you see what's in it? I don't have anything in it.

Q: I know, sir, you don't have it wrapped around your hand today at the jury trial. My question is, on July 11th, you have heard her testify she saw you with it wrapped around your hand. She described it as a terrycloth handkerchief.

A: I would not do that. I've been trying ever since I've been in jail to figure out how I could do that, how I could hold it.

Q: Well, I'm not going to get into the trap of wrapping it around your hand, but you think you might figure out a way that it be construed -- not that handkerchief; there's no evidence that that was what we're talking about. She testified it was a terrycloth rag that you wrapped around your hand and had fashioned so that she couldn't see what was in it. Is that true or not true?

A: I had a terrycloth rag just like this, identical except that it had green stripes in it. Identical.

Q: So is it true or not true that it was wrapped around your hand?

A: It was gathered in the palm of my hand just like this (indicating).

By the defendant's own admission, the rag he had at trial was "identical" to the rag he had during the incident except for the color of the stripes, and, as excerpted above, he used many opportunities to demonstrate that the rag could not have concealed his hand as alleged by the victim. As such, the actual rag does not qualify as "material," and it is moreover apparent that the defendant's trial was fundamentally fair even without the actual rag from the incident.

The defendant also argues that "[m]uch was made, on cross examination of the defendant, of the fact that there was no currency in the defendant's property. The State used the absence of this currency to impeach the defendant and discredit his testimony." With regard to this issue, we first note that it is a stretch to say "[m]uch was made" of the defendant's having no currency in his possession because, in reality, the State asked three questions regarding the amount of money the defendant had when he was arrested out of a cross-examination that consisted of twenty-five pages. Defense counsel immediately re-examined the defendant, and the defendant testified that, in addition to the twenty-four dollars, his pain and seizure medications and the rag used during the incident were

also not in Sergeant Antracan's possession. Moreover, the State did not mention the currency in its opening or closing arguments. We cannot conclude that there is a reasonable probability that the result of the proceeding would have been different had the twenty-four dollars been accounted for by Sergeant Antracan; the defendant received a fundamentally fair trial.

### III. Confrontation

The defendant next argues that his right to confront witnesses was "abridged and violated" by the State's calling a rebuttal witness whom his counsel could not cross-examine. In State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001), our supreme court explained:

> A defendant has the right to examine witnesses to impeach their credibility or to establish that the witnesses are biased. This includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. See State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); see also State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). An undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution. See Smith, 893 S.W.2d at 924; see also State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991).

After the defense rested its case, the State called Gregory McKee to testify as a rebuttal witness. At which point, defense counsel requested a bench conference and the following exchange ensued:

[Defense Counsel]: Your Honor, the Rules of Professional Conduct prohibit me from cross-examining Gregory McKee.

[Prosecutor]: Your Honor, Mr. McKee has told me that [co-defense counsel] had been back to see him and they were aware that there might be some issue with Mr. McKee before this trial. Mr. McKee says the Public Defender's office has been back to see him already.

[Defense Counsel]: And I approached the lead counsel for the State with it this morning and was told that they would not be calling him.

[Lead Prosecutor]: I never said that. I said we cannot say who our rebuttal witnesses are going to be; I was not going to call Mr. McKee in my case in chief.

[Defense Counsel]: And you also said that you wouldn't call him unless there was another inmate that you could call.

[Lead Prosecutor]: I never would have said that, Your Honor.

[The Court]: If that's an objection to calling the witness, the objection will be overruled.

As previously recited in detail, McKee then essentially testified that the defendant offered to pay him to testify that he had witnessed the defendant involved in a "fracas" in the Save-a-Lot parking lot and that a woman was also going to testify on his behalf.

We initially note that the defendant has arguably waived this issue for failing to make a clear contemporaneous objection. As noted above, defense counsel called for a bench conference to discuss the matter, but he did not elucidate to the court why the Rules of Professional Conduct prevented him from cross-examining McKee, which in turn prevented the court from taking appropriate action "to prevent or nullify the harmful effect of [the] error." Tenn. R. App. P. 36(a). It was not until the motion for new trial when defense counsel offered as an exhibit an "Order Appointing Legal Counsel" that he indicated he had represented McKee at some point.

In any event, we conclude that any error resulting in the defendant not being able to cross-examine McKee was harmless. The State used the testimonies of the victim and the police officers to establish the defendant's guilt and only used McKee to question the defendant's credibility and Dominique Morgan's testimony. However, the State had already challenged the defendant's credibility, as well as the sketchiness of Morgan's observations, during those respective cross-examinations. Moreover, the defendant testified prior to McKee's testimony that "[he] didn't have $500.00 in the first place even if [he] had wanted someone to give false testimony"; a very believable statement given he made his living as a panhandler. The defendant also testified again in rebuttal immediately after McKee to further contradict McKee's testimony. Furthermore, the State asked McKee during direct examination if he had been promised anything in exchange for his testimony, and McKee's criminal record was no secret as he was admittedly serving time in jail for his fourth or fifth offense of driving under the influence. This is the type of information that would have been revealed during cross-examination. In light of the above, we conclude, "assuming that the damaging potential of the cross-examination were fully realized, that [any] error was nonetheless harmless beyond a reasonable doubt." State v. Howell, 868 S.W.2d 238, 253 (Tenn. 1993).

## IV. Sufficiency

The defendant lastly challenges the sufficiency of the convicting evidence. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony

of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, when accomplished by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. Tenn. Code Ann. § 39-13-402(a) (2006).

In the light most favorable to the State, the evidence shows that the defendant approached the victim with his hand covered in some type of terrycloth towel and said, "Give me the money bag." The victim told the defendant that she did not have the money bag, and the defendant raised his hand covered in the terrycloth towel and said, "That bag," indicating her purse. The victim thought that there appeared to be something in the defendant's hand but could not see because of the covering. The victim gave the defendant her purse because she "felt that that was the only choice [she] had. [She] assumed he had a weapon pointed at [her] . . . [and] was afraid that if [she] didn't comply, he would shoot [her]." This proof was sufficient for a rational trier of fact to determine that the defendant took the victim's property by putting her in fear, accomplished with the display of an article fashioned to lead the victim to reasonably believe it to be a deadly weapon.

Tennessee Code Annotated section 39-16-603(b)(1) (2006) provides: "It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from such officer to bring the vehicle to a stop." When the flight or attempt to elude law enforcement creates a risk of death or injury to innocent bystanders or other third parties, the crime is elevated from a Class E to a Class D felony. Id. § 39-16-603(b)(3).

In the light most favorable to the State, the evidence shows that several police officers in marked and unmarked cars, with lights and sirens activated, followed the defendant for approximately sixteen or seventeen miles before effectuating a stop using a boxing maneuver. Although the vehicles traveled only "a little bit over the posted speed," the pursuit took place on roads that were hilly and, at times, small, narrow, and curvy. "Several" civilian vehicles were

encountered during the pursuit.  In particular, Detective Delashmit testified that when Investigator Rose pulled over into the defendant's lane to initially try and stop him, "[t]here was another car coming toward us that was behind Mr. Rose's vehicle I would guesstimate four car lengths."  He said, "That vehicle got off the road and as soon as we got by, he, I'm assuming, continued on."  Detective Delashmit also testified that when Investigator Rose was in the defendant's lane trying to stop him, "I saw the defendant not stop.  I saw Investigator Rose attempt to get out of his way and the truck jerked over toward Mr. Rose's vehicle and continued on."  On cross-examination of Detective Delashmit, the following exchange occurred:

Q:  Now, you said that you saw several cars during all of this?

A:  Yes, sir.

Q:  Which of those cars did [the defendant] put in danger?

A:  I -- really with that many police cars following, I would have to assume all of them.

Q:  You say it was [the defendant] that put them in danger, not all the police cars following, though, right?

A:  Well, we were doing what we thought we were justified legally doing in trying to apprehend a suspect.

Q:  But Investigator Rose wasn't in the right lane, was he?

A:  No, sir.

Based on this evidence, a rational trier of fact could have found that the defendant intentionally fled or attempted to elude law enforcement, after having received a signal to bring his vehicle to a stop, and in doing so created a risk of death or injury to innocent bystanders during the pursuit.  We note there is no requirement that a defendant's actions create a "near miss" situation in which a third party motorist is forced to swerve or leave the roadway in order to avoid a collision, or that the third parties placed at risk be specifically named.  See Tenn. Code Ann. § 39-16-603(b)(3); State v. Kerry L. Dowell, No. M2002-00630-CCA-R3-CD, 2003 WL 21486978, at *9 (Tenn. Crim. App. June 27, 2003), perm. to appeal denied (Tenn. Nov. 24, 2003) (concluding that officer's testimony that road was "busy" at time defendant drove onto it without stopping was sufficient to establish that he placed third parties at risk and, thus, that his flight from officers constituted Class D felony evading arrest); State v. Mario Ricky Orlando Printis, No. W2000-03032-CCA-R3-CD, 2002 WL 1482707, at *3 (Tenn. Crim. App. Feb. 27, 2002) (affirming defendant's conviction for Class D felony evading arrest on basis of officer's testimony "there were other cars on the road during the high-speed chase").

-13-

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE